UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
CHRISTOPHER WHITEHEAD ,

           MEMORANDUM AND ORDER

      Plaintiff,           12 Civ. 0951 (ILG) (VVP)

    - against -

THE CITY OF NEW YORK, et al.

      Defendants.
------------------------------------------------------x
GLASSER, Senior United States District Judge:

      Plaintiff Christopher Whitehead ("Whitehead" or "plaintiff"), a current employee of the City of New York Police Department ("NYPD"), brings this action against Michael Marino ("Marino"), a current employee of the NYPD, the City of New York, and the NYPD (collectively "defendants"), alleging unconstitutional retaliation in violation of 42 U.S.C. § 1983 ("§ 1983") and various state laws.

      Currently before the Court is defendants' motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth below, defendants' motion is hereby GRANTED.

## I. FACTS & PROCEDURAL HISTORY

      The following facts are taken from Whitehead's complaint and are accepted as true for purposes of this motion. Whitehead is currently a police officer in the NYPD. He has been employed as a police officer since 1998 and has been assigned to the 75th Precinct in the East New York section of Brooklyn since 2000. Complaint dated Feb. 28, 2012 ¶¶ 4, 11-12 ("Compl.") (Dkt. No. 1). On or about September 2002, Marino, then an Inspector with the NYPD, became the Commanding Officer ("CO") of the 75th Precinct. Id. ¶ 14. Within months of becoming the CO of the 75th Precinct, Marino

1

instituted an allegedly illegal quota policy that required each officer assigned to the 75th Precinct to issue ten tickets and make one arrest each month or face a low performance evaluation score.  Id. ¶ 15.

While Whitehead had previously received competent or highly competent ratings, in his 2003 performance evaluation, the first under Marino's quota policy, Whitehead received a below competent rating because he did not achieve the required number of tickets and arrests.  Id. ¶¶ 13, 16.  On or about January 2004, Marino called Whitehead into his office for a meeting regarding Whitehead's failure to satisfy the quota policy.  Whitehead explained that he did not have sufficient opportunities to issue tickets or make arrests because he was rarely assigned patrol duty.  Marino replied that he would put Whitehead on Level II Performance Monitoring or terminate Whitehead's employment if he did not comply with the quota policy.  Id. ¶ 17.[1]  Marino placed Whitehead on Level II Performance Monitoring shortly thereafter.  Id. ¶ 19.

A few months after being placed on performance monitoring, Whitehead was ordered to Police Headquarters where he was told that he would be closely monitored and that if his performance evaluations did not improve within 18 months, then he would be placed on Level III Performance Monitoring, known as dismissal probation.  Id. ¶ 20.  While on performance monitoring, Whitehead vocalized his opposition to the quota system to Marino and several of his supervisors.  Id. ¶ 25.  Because Whitehead did

---

[1] Level II Performance Monitoring is a program within the NYPD that subjects officers to much closer scrutiny, including additional interim evaluations, increased integrity tests, and home visits by supervisors when out sick.  Compl. ¶ 21.  Officers on Level II Performance Monitoring are also ineligible to participate in the NYPD paid detail program to work off-duty in uniform at retail establishments.  Id. ¶ 22.

not satisfy the quota policy, he received below competent ratings for calendar years 2004 and 2005 and remained on Level II Performance Monitoring.  Id. ¶¶ 23, 31.

On or about 2005, the Patrolmen's Benevolent Association of the City of New York ("PBA") filed a grievance under its collective bargaining agreement asserting that the quota policy violated New York Labor Law § 215-a[2].  Id. ¶ 26.  In preparation for the arbitration hearing pursuant to the collective bargaining agreement, Whitehead met with the PBA and agreed to testify but, ultimately, was not called as a witness.  However, Marino and other supervisors within the 75th Precinct were allegedly aware of Whitehead's cooperation.  Id. ¶ 27.  The arbitration hearing was held on June 16, 2005, and the arbitrator determined, in a January 14, 2006 decision, that the quota policy violated Labor Law § 215-a, and permitted officers who felt that they were unfairly penalized under the policy to be reevaluated without reference to the policy.  Id. ¶¶ 28, 33.  Whitehead filed a timely appeal of his 2005 evaluation to Inspector David Barrere, then-CO of the 75th Precinct, who denied the appeal without explanation.  Whitehead

---

[2] New York Labor Law § 215-a provides that:

> No employer or his or her duly authorized agent shall transfer or in any other manner penalize or threaten, expressly or impliedly, an employee as to his or her employment in a manner, including, but not limited to, a reassignment, a scheduling change, an adverse evaluation, a constructive dismissal, the denial of a promotion, or the denial of overtime, based in whole or in part on such employee's failure to meet a quota, established by his or her employer or his or her duly authorized agent, of (a) tickets or summonses issued within a specified period of time for violations of provisions of law for which a ticket or summons is authorized by any general, special or local law; or (b) arrests made within a specified period of time for violations of provisions of law for which such arrest is authorized by any general, special or local law; or (c) stops of individuals suspected of criminal activity within a specified period of time.

N.Y. Labor Law § 215-a (McKinney 2012).

3

was informed that he could further appeal his evaluation at the borough level; however, Marino had been promoted to Deputy Chief of Brooklyn North in 2005 and handled evaluation appeals. Id. ¶¶ 24, 29, 33, 35. Presumably, Whitehead did not appeal his evaluation at the borough level because he thought it was futile.

On or about April 2005, Whitehead was assigned to the Field Training Unit ("FTU"), which he viewed as a demotion because it was staffed primarily with recent graduates of the police academy. Id. ¶ 32. Whitehead alleges that this demotion was in retaliation for his opposition to the quota policy, and was based on a personal vendetta held against him by Marino. Id. ¶¶ 32, 34. On May 3, 2006, Lieutenant Douglas Satchwell told Whitehead that he would be returned to his previous assignment if he showed "FTU-like activity," which Whitehead understood to mean a high number of tickets and arrests. Id. ¶ 34. At the end of 2006, Whitehead received an above-competent rating because he satisfied the required quota. Id. ¶ 37.

On or about April 2007, despite his recent satisfactory performance review, Whitehead was ordered to Police Headquarters where he was informed that his supervisor recommended that he remain on monitoring for insufficient activity. Id. ¶ 38. Whitehead was then threatened with Level III Performance Monitoring and told to stop and question people without the constitutionally required reasonable suspicion of criminal activity in order to increase his monthly activity report. Id. In or about June 2007, Whitehead was transferred to a midnight cell attendant position and he received a highly competent rating in his 2007 evaluation. Id. ¶¶ 39-40. Whitehead was removed from performance monitoring status on or about November 2007. Id. ¶ 39.

In or about January 2008, Whitehead took the sergeant exam and was ranked 58 out of the 671 applicants who passed the test. Id. ¶ 41. Because Whitehead had received

4

low evaluation scores in the past and was previously on Level II Performance Monitoring, he was required to appear before the Career Advancement Review Board ("CARB"), once in 2008 and again in 2010, before being promoted. Id. at ¶¶ 41-43. During both appearances, Whitehead was asked to assume responsibility for his low evaluations, and in both Whitehead refused because he viewed the low evaluations as "tainted." Id. ¶ 43. In the first appearance, CARB suggested that Whitehead request a transfer to a patrol duty assignment in order "to get additional activity." Id. ¶ 43. On or about November 2009, Whitehead met with his CO and was transferred to patrol duty, where he received highly competent evaluations. Id. ¶¶ 44-45. Despite high evaluations and laudatory letters of recommendation, Whitehead was not promoted to sergeant while applicants with lower test scores and departmental convictions for criminal offenses were allegedly promoted. Id. ¶ 46.

On or about December 1, 2010, the 2008 sergeant list was cancelled, precluding Whitehead's promotion without re-taking the sergeant exam. Id. ¶ 48.[3] Whitehead alleges, inter alia, that he was never promoted in retaliation for engaging in activities protected by the First Amendment, namely, publicly opposing the quota policy, preparing to assist an arbitration regarding the quota policy, and filing a grievance with his commanding officer. Id. ¶ 52-57.

On February 28, 2011, Whitehead filed a grievance under Labor Law § 215-a and the collective bargaining agreement with the PBA, but has not yet received a response. Id. ¶ 50. Whitehead initiated this action against defendants on February 28, 2012,

---

[3] The 2008 sergeant list presumably refers to officers who took the sergeant exam in 2008, not officers who appeared before CARB in 2008, although the Complaint is not clear on this point.

asserting claims under 42 U.S.C. § 1983 for First Amendment retaliation and Fourteenth Amendment Equal Protection violations, as well as violations of various state laws. Id. ¶ 1. Defendants, on May 22, 2012, filed their motion to dismiss, arguing, among other things, that Whitehead's speech was not constitutionally protected. Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint ("Defs.' Mem.") at 1-2 (Dkt. No. 6). On June 8, 2012, Whitehead filed his papers in opposition to defendants' motion, Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint ("Pl.'s Opp'n") (Dkt. No. 8), and on June 27, 2012, defendants filed their reply. Memorandum of Law in Further Support of Defendants' Motion to Dismiss the Complaint ("Defs.' Reply") (Dkt. No. 10).

## II. DISCUSSION

### A. Legal Standard

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." To survive a motion to dismiss pursuant to Rule 12(b)(6), the plaintiff's pleading must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim has facial plausibility "when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

Although detailed factual allegations are not necessary, the pleading must include more than an "unadorned, the-defendant-unlawfully-harmed-me accusation;" mere legal conclusions, "a formulaic recitation of the elements of a cause of action," or "naked assertions" by the plaintiff will not suffice. Id. (internal quotations and citations

6

omitted).  This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Id. (quoting Twombly, 550 U.S. at 556).  Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  Iqbal, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

### B. First Amendment Retaliation Claim

#### 1. Case Law

"In the First Amendment context, 'the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general.'"  Ross v. Breslin, --- F.3d ----, 2012 WL 3892396, at *3 (2d Cir. Sept. 10, 2012) (quoting Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty., Ill., 391 U.S. 563, 568 (1968)).  Deciding whether speech by a public employee is protected by the First Amendment "first requires determining whether the employee spoke as a citizen on a matter of public concern."  Garcetti v. Ceballos, 547 U.S. 410, 418 (2006).  "The First Amendment limits the ability of a public employer to leverage the employment relationship to restrict . . . the liberties employees enjoy in their capacities as private citizens."  Id. at 419.  Conversely, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  Id. at 421.

7

In Garcetti, the plaintiff, a deputy district attorney, claimed that he was subject to retaliatory employment action for drafting a memo recommending that charges against a defendant be dismissed because a search warrant was obtained with significant misrepresentations. 574 U.S. at 413-15. The Supreme Court rejected the claim because the plaintiff "spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case," and not as a citizen. Id. at 421. The Court held that "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." Id. at 421-22 (citation omitted).

The Second Circuit considered the applicability of Garcetti to public employee union grievances in Weintraub v. Bd. of Educ. of the City Sch. Dist. of the City of New York, 593 F.3d 196 (2d Cir. 2010). In Weintraub, a teacher alleged First Amendment retaliation for complaining about and then filing a formal grievance about the school administration's failure to punish a student for throwing a book in class. Id. at 198-99. The court held that "Weintraub spoke pursuant to his job duties," and not as a citizen, because "his speech ultimately took the form of an employee grievance, for which there is no relevant citizen analogue." Id. "Rather than voicing his grievance through channels available to citizens generally, Weintraub made an internal communication pursuant to an existing dispute-resolution policy established by his employer, the Board of Education. As with the speech at issue in Garcetti, Weintraub could only speak in the manner that he did by filing a grievance with his teacher's union as a public employee," and, therefore, "retained no possibility of constitutional protection." Id. (internal citations and quotations omitted).

8

Most recently in Ross v. Breslin,[4] the Second Circuit addressed the effect of going outside the chain of command upon First Amendment retaliation claims by public employees. 2012 WL 3892396. The plaintiff, a payroll clerk for a school district, claimed that she was fired because she reported payroll irregularities to her supervisor, the district superintendent, and the school board. Id. at *1-2. She argued that "she was speaking as a private citizen because she went outside the chain of command," and, therefore, her speech was protected by the First Amendment. Id. at *6. The court rejected this argument, finding that reporting payroll irregularities were part of her duties, and that going outside the chain of command "does not, without more, transform her speech into protected speech made as a private citizen." Id. (quoting Anemone v. Metro. Transp. Auth., 629 F.3d 97, 116 (2d Cir. 2011)). As a result, the court found that "Ross's complaints were made pursuant to her official duties and therefore were not protected by the First Amendment." Ross, 2012 WL 3982396, at *1.

Many district courts have applied these principles to First Amendment retaliation claims by police officers, and the Court will consider only a few such decisions here. In Frisenda v. Inc. Vill. of Malverne, a former police lieutenant alleged that he was not promoted based on a memorandum he wrote recommending procedural and training changes to the police department. 775 F. Supp. 2d 486, 493-501 (E.D.N.Y. 2011). He further alleged that he was not promoted because of his membership and participation in a police union, his refusal to organize a new supervising police officer union, and his deposition testimony in another officer's lawsuit against the village. Id. In a lengthy and carefully reasoned opinion, the court found that the memorandum was not

---

[4] The Second Circuit decided Ross after this motion was fully briefed.

9

protected speech because "the subject matter of plaintiff's speech . . . related to his employment," the memorandum "was only made internally," and "the issues raised in the Memorandum were things he came to learn as part of his duties and responsibilities." Id. at 506-07. "[T]aken together, all of these undisputed facts paint a clear picture of an employee speaking out about his views regarding how best to perform his job duties, rather than of someone attempting to make a 'contribution to the civic discourse.'" Id. at 507 (quoting Garcetti, 547 U.S. at 422). However, the court also found that plaintiff's union activities and involvement in "a public proceeding or a lawsuit is a kind of speech that is protected by the First Amendment." Frisenda, 775 F. Supp. 2d at 509-10 (quoting Kaluczky v. City of White Plains, 57 F.3d 202, 210 (2d Cir. 1995)).

In Matthews v. City of New York, an NYPD officer alleged that he was subject to retaliation, including receiving punitive assignments, such as footposts and prisoner transport, and negative performance evaluations, for criticizing a quota system to his commanding officers. 12 cv 1354 (BSJ), 2012 U.S. Dist. LEXIS 53213, at *1-3 (S.D.N.Y. Apr. 12, 2012). The court found that "complaints about precinct mismanagement . . . [are] not protected under well established Supreme Court precedent" because plaintiff's "complaints about the quota and monitoring system fell squarely within his job responsibilities." Id. at *5-8.

### 2. Plaintiff's Speech Is Not Protected by the First Amendment

Plaintiff alleges that he was not promoted to sergeant based on three events that he claims are protected by the First Amendment: (1) refusing to comply with the quota policy; (2) filing a union grievance against the NYPD; and (3) participating in the union

10

arbitration. Pl.'s Opp'n at 10-14. Applying the case law discussed <u>supra</u>, none of these activities are protected by the First Amendment.

Plaintiff's refusal to comply with the quota policy is not protected by the First Amendment because he confined his opposition to and criticism of the quota policy within the NYPD and "never attempted to communicate [his] complaints to the public." <u>Ross</u>, 2012 WL 3982396, at *6. Plaintiff's statements and actions are unprotected, like the memorandum in <u>Frisenda</u>, because they relate to police employment, were only made internally, and raise issues that he came to learn as part of his duties and responsibilities as a police officer. <u>See</u> 775 F. Supp. 2d at 506-07. Moreover, plaintiff's complaints about the quota system are nearly identical to those at issue in <u>Matthews</u>, which the court found unprotected. Plaintiff attempts to distinguish <u>Matthews</u> by arguing that whereas Matthews only voiced his concerns, plaintiff "not only complained to his superiors, but also . . . refused to comply with the illegal quota policy." Pl.'s Opp'n at 13. This argument is unavailing because Matthews did not merely speak out about the quota system; he also received "negative performance evaluations," indicating that he, too, refused to comply. 2012 U.S. Dist. LEXIS 53213, at *2-3. While conduct can be constitutionally protected speech, refusing to comply with the illegal quota policy is not expressive conduct because it has no communicative impact on the public. <u>See</u> <u>United States v. O'Brien</u>, 391 U.S. 367, 377, 381-82 (1968).

Plaintiff relies heavily on <u>Jackler v. Byrne</u>, where a probation officer alleged that he was not hired as a full-time police officer because he refused to retract a truthful civilian complaint that he filed with the police department detailing police abuse, despite police pressure to do so. 658 F.3d 225, 230-32 (2d Cir. 2011). The court held that plaintiff's refusal "to retract his truthful statements and make statements that were

11

false" were protected by the First Amendment because filing a false report with the police "has a clear civilian analogue," so "Jackler was not simply doing his job in refusing to obey those orders." Id. at 241-42. Plaintiff reasons that since meeting the quota policy would require him to file false reports, his conduct is protected by the First Amendment under Jackler. Pl.'s Opp'n at 11-12. However, Jackler is distinguishable, as it was in Ross and Matthews, because plaintiff here alleges that he "suffered retaliation for making affirmative statements of misconduct to [his] supervisors, not for refusing to make false statements that no misconduct had occurred." Ross, 2012 WL 3982396, at *7 (distinguishing Jackler). As the court in Matthews explained, Jackler drew a distinction between speech that is pursuant to job duties, which is unprotected, and speech that is merely related to job duties, which is protected. 2012 U.S. Dist. LEXIS 53213, at *11-12. In Jackler, filing the report with the police was pursuant to Jackler's job duties and unprotected, but Jackler's refusal to retract his truthful statements was only related to his job duties and, therefore, protected by the First Amendment. Id. Similarly, plaintiff's allegations that he would have to file false reports to comply with the quota policy describe activities that are pursuant to his job duties, so they are not protected under Jackler.

Plaintiff did not engage in constitutionally protected speech by filing a labor grievance with the PBA because the Second Circuit has explicitly held that "by filing a grievance with his union," plaintiff "was speaking pursuant to his official duties and thus not as a citizen." Weintraub, 593 F.3d at 201. While plaintiff correctly notes that "retaliation against public employees solely for their union activities violates the First Amendment," a party must actually engage in "union activity" to "trigger First Amendment protection." Clue v. Johnson, 179 F.3d 57, 60-61 (2d Cir. 1999). In

12

Frisenda, the court found that plaintiff's actions were protected by the First Amendment because he was heavily involved in union activities, held several elected leadership positions within the union, and was an integral part of efforts to form a separate supervising police officer union. 775 F. Supp. 2d at 493-95. Here, plaintiff was not involved in union leadership or organizing; he merely claims to have "assist[ed] the Union in pursuing a grievance against the NYPD" by offering to testify at an arbitration. Pl.'s Opp'n at 13. Yet, as defendants point out, "he did not actually testify during the arbitration resulting from the filed grievance." Defs.' Reply at 4. Plaintiff's minor role in the union grievance process is more like the unprotected conduct in Weintraub than the protected conduct in Frisenda. Therefore, plaintiff's reliance on union activities and on Frisenda for First Amendment protection are misplaced. Pl.'s Opp'n at 13-14.

Finally, plaintiff's participation in the quota policy arbitration is not protected by the First Amendment because he did not publicly testify and was only able to participate in the arbitration because of his position as a police officer. Plaintiff again relies on Frisenda, where the plaintiff alleged retaliation for testifying at a deposition in another police officer's lawsuit against the village. 775 F. Supp. 2d at 510. The court held that "voluntarily appearing as a witness in a public proceeding or a lawsuit is a kind of speech that is protected by the First Amendment." Id. (internal quotation omitted). Frisenda is distinguishable, however, because plaintiff never testified.[5] Moreover, a labor union arbitration is unlike the lawsuit at issue in Frisenda because a union

---

[5] While plaintiff boldly asserts that "[t]he fact that he was not called to testify is a distinction without a difference," he cites to no authority for this proposition. Pl.'s Opp'n at 14. Rather, it is specifically the act of "testifying truthfully [that] is constitutionally protected from retaliation," not merely offering to testify. Benedict v. Town of Newburgh, 95 F. Supp. 2d 136, 143 (S.D.N.Y. 2000).

13

arbitration, like the union grievance in Weintraub, "is not a form or channel of discourse available to non-employee citizens"; rather, it is an "an existing dispute-resolution policy established" by the NYPD and the PBA. 593 F.3d at 204. Plaintiff asserts, without citing any authority, that "any attempt . . . to differentiate between a civil lawsuit and the arbitration agreement will be unavailable." Pl.'s Opp'n at 14. However, unlike in a civil lawsuit, plaintiff could only participate in the arbitration because he is an NYPD employee, Weintraub, 593 F.3d at 204, and could only testify, if he had, based on knowledge that he learned in his duties and responsibilities for the NYPD. See Frisenda, 775 F. Supp. 2d at 506-07. Plaintiff's participation in the arbitration, therefore, "lacked a relevant analogue to citizen speech and 'retained no possibility' of constitutional protection." Weintraub, 593 F.3d at 204 (quoting Garcetti, 547 U.S. at 423).

Since all of plaintiff's actions and statements were made in and arose out of his capacity as a police officer and not as a citizen, none are protected by the First Amendment. Therefore, defendants' motion to dismiss plaintiff's First Amendment claim is granted.

### C. Fourteenth Amendment Equal Protection Claim

Plaintiff claims that he was subject to "selective treatment with the intent of punishing him for exercising rights protected by the United States Constitution" in violation of the Equal Protection Clause of the Fourteenth Amendment. Compl. ¶ 66. Because plaintiff is not claiming membership in a protected class but simply that he was treated differently from others similarly situated, plaintiff is advancing a so-called

14

"class-of-one" theory. <u>Frisenda</u>, 775 F. Supp. 2d at 517-18.[6] The Supreme Court has clearly held that "a 'class-of-one' theory of equal protection has no place in the public employment context." <u>Engquist v. Oregon Dep't of Agric.</u>, 553 U.S. 591, 594, 605-08 (2008). Moreover, "to the extent that plaintiff also may be attempting to assert an equal protection claim based upon retaliation for First Amendment activity (rather than under a class-of-one theory), such a claim is completely duplicative of the First Amendment retaliation claim," which has already been dismissed. <u>Frisenda</u>, 775 F. Supp. 2d at 518 (citing cases). Accordingly, defendant's motion to dismiss plaintiff's Fourteenth Amendment Equal Protection claim is granted.

## D. State Law Claims

The Court may decline to exercise supplemental jurisdiction over any and all state law claims of a complaint if the Court has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). "It is well settled that where, as here, the federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims." <u>Klein & Co. Futures, Inc. v. Bd. of Trade</u>, 464 F.3d 255, 262 (2d Cir. 2006). Plaintiff's state law claims are therefore dismissed without prejudice in order to allow plaintiff to pursue his state law claims in state court if he so chooses. <u>See</u> <u>Cave v. East Meadow Union Free Sch. Dist.</u>, 514 F.3d 240, 250 (2d Cir. 2008).

## III.   CONCLUSION

---

[6] Plaintiff asserts that his "Equal Protection claim was not based upon a 'class-of-one' theory," but then states in the next sentence that his claim is based upon the fact that "he was treated differently than others similarly situated" without any reference to a protected class, the very exemplar of a class-of-one claim. Pl.'s Opp'n at 15 & n.3.

For the foregoing reasons, defendants' motion to dismiss is GRANTED. Plaintiff's federal claims are dismissed with prejudice and the Court declines to exercise supplemental jurisdiction over the state law claims.

SO ORDERED.

Dated:      Brooklyn, New York
               October 15, 2012

                                                      /s/ ILG
                                         I. Leo Glasser
                                         Senior United States District Judge